**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

DAVID ELLIS,

               Petitioner,              Case Number: 04-CV-71304-DT
                                          HONORABLE ARTHUR J. TARNOW

v.

JIMMY STEGALL,

               Respondent.

_____/

**OPINION AND ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

**I. Introduction**

Petitioner David Ellis has filed a pro se petition for writ of habeas corpus under
28 U.S.C. § 2254, challenging his state court convictions for first-degree felony
murder, carjacking, armed robbery, and conspiracy to commit carjacking.  For the
reasons given below, the habeas petition is denied.

**II. Factual and Procedural Background**

Petitioner was convicted by jury in Wayne County Circuit Court on September
28, 1999 of the above charges.  He was sentenced to mandatory non-parolable life
on the felony murder conviction, and to concurrent 45 to 80 year terms on each of
the three remaining convictions.

Petitioner's daughter, Tekesha Ellis, and his niece, Timarra Bush, were also
charged with the above offenses, but were allowed to plead guilty to second-degree

murder and conspiracy, with a sentence agreement of 15-30 years for the murder and 10 to 20 years for the conspiracy.  In exchange, they testified against Petitioner at trial.

Their testimony established the following:  On October 12, 1998, Ms. Ellis and Ms. Bush, desiring to return to South Bend, Indiana, but lacking transportation, discussed their problem with Petitioner.  Together, they decided to carjack a vehicle. They planned to have Ms. Bush lure someone to the home of Mr. Ellis's mother with the promise of sex, then to hit him and take his car.  They walked down Joy Road, and Petitioner retrieved a pipe from some trash.  They spotted a gray Lincoln Continental in the parking lot of a strip club, and waited for the owner to return. Petitioner positioned himself across the street.  When C.W. Crump approached his car, Ms. Bush engaged him in conversation, and he offered the women a ride.  After arriving at the home of Petitioner's mother, Ms. Bush went into the bedroom with Mr. Crump.  Shortly after, Petitioner and Ms. Ellis entered the room, and Petitioner repeatedly hit Mr. Crump with the pipe.  They then tied Mr. Crump up with a clothesline from the basement.  Petitioner took his car keys and then dragged him to the basement, and, from the sounds the women heard, continued beating him.

After the women made an unsuccessful attempt to clean up the considerable amount of blood, Mr. Crump, still alive, was wrapped in a blanket and placed in the trunk of his car.  After stopping briefly to pick up the women's clothes at Sherry Thompson's house in Ecorse, they proceeded to drive to South Bend.  On the way,

they removed Mr. Crump, who was no longer moving, and dumped his body in a wooded area.  They remained in South Bend, all three using Mr. Crump's car and the cell phone in his car, until they were arrested a few weeks later.

Other critical evidence at trial included the following: Jacquline Ellis, Petitioner's mother, testified that she found blood all over her basement and bedroom when she returned home on the evening of October 13, 1998.  Her grandson added that a clothesline was missing from the basement.  Petitioner had been staying with her for about a month, and he was gone.  Eventually, she called South Bend and determined that Petitioner was there.

The body of the deceased was found on October 18, 1998, in a wooded area off of I-94.  It was wrapped in a comforter which Mrs. Ellis identified as one that she had discovered missing from her bed that day.  The hands and feet were bound with two types of rope, one being a clothesline.

The cause of death was multiple blunt force injuries.  The injuries were extensive and varied, and included nine linear scalp lacerations consistent with the decedent having been repeatedly hit with a metal pipe, eight broken ribs caused by blunt force, multiple contusions on the trunk and extremities, and abrasions consistent with the body having been dragged.

DNA testing confirmed that a blood sample from Mrs. Ellis house, and blood samples from the trunk of the decedent's car, were consistent with the decedent's DNA profile.

Derry Vaughn, an old friend of Petitioner, testified that, on October 14, 1998, Petitioner appeared at his home in South Bend, driving a Lincoln Continental with a cell phone inside. Over the next few weeks, there were times that Vaughn rode in the car with Petitioner, and, in fact, he was arrested driving the car. He also saw Ms. Ellis and Ms. Bush driving the car.

Sherry Thompson, who has two children by Petitioner, testified that in October of 1998, Ms. Ellis and Ms. Bush had been staying with her for about two months. They asked her several times to drive them back to South Bend, so that they could celebrate their birthdays there. She overheard Ms. Ellis telling Ms. Bush that she had just gotten off the phone with her "daddy" and something about things being set for "ganking" a car. The day before she heard about the blood at Mrs. Ellis's house, she saw Petitioner standing outside a car parked down the street. This was also the day the girls disappeared, or the day before.

Melanie Bartel, Petitioner's girlfriend, testified that in August of 1998, she and Petitioner were in financial trouble, and lost their town house and their car. Petitioner moved in with his mother. Sometime in the middle of October, Petitioner disappeared. She received calls from Petitioner on October 16 and 22, 1998. He told her he was in Indiana. It was further established that the phone number indicated on her caller ID was the number for Mr. Crump's cell phone.

Mr. Elllis was arrested in South Bend on October 29, 1998. He gave a taped statement the next day, providing the following: He came home to find his daughter

4

and niece struggling with a large man, and they were yelling for help.  Petitioner tried to help, but the man came after him.  Ms. Bush hit the man in the head with a pipe a couple of times.  The man went after his daughter, so Petitioner took the pipe and hit him a couple of times.  The man "just went out."  Petitioner "went off on" the two women, for getting into this.  He denied that he had any involvement before this point.  Ms. Ellis and Ms. Bush tied the man up and tried to clean the house.  They put the man in the trunk of the man's car, wrapped in Mrs. Ellis's blanket.  The two women drove off to collect their clothes, while Petitioner waited at the house.  They picked him up, and Ms. Ellis drove them to South Bend.  The women decided to pull over at some point and, at their request, he helped move the body from the car.  The pipe was thrown in a dumpster.  They stopped to see Mr. Vaughn when they got to South Bend.  Petitioner continued to use the car and the cell phone that was in the car.  Petitioner denied being part of any plan, and denied any intent to kill or hurt anyone.

The defense argued a self defense theory.  The jury convicted Petitioner as charged.

Petitioner appealed as of right, raising the same four issues he does now. The Michigan Court of Appeals affirmed in an unpublished per curiam opinion. *People v. Ellis*, 2002 WL 865455 (Mich. App. April 30, 2002).  Petitioner filed an Application for Leave to Appeal in the Michigan Supreme Court, presenting the same claims. The Michigan Supreme Court denied leave to appeal by order ("[W]e are not

5

persuaded that the questions presented should be reviewed by this Court."). Kelly,

J., would have granted leave to appeal. *People v. Ellis*, 468 Mich. 884, 661 N.W.2d

233 (2003).

On April 7, 2004, Petitioner filed the pending petition for a writ of habeas

corpus, presenting the following issues:

> I. The trial court should have suppressed Petitioner's statement to the police where the police continued questioning Petitioner after he invoked his Miranda right to silence.

> II. The state prosecutor made an improper civic duty argument and disparaged defense counsel, which denied the Defendant due process pursuant to the state and federal constitutions.

> III. The prosecutor violated Petitioner's due process rights by referring in his opening statement to other alleged uncharged robberies where the prosecutor failed to timely notify defense trial counsel of the intent to introduce such acts.

> IV. The trial court violated Petitioner's due process right to confront and cross-examine witnesses by refusing to allow defense trial counsel to elicit that Petitioner's daughter and niece avoided charges punishable by mandatory life imprisonment in exchange for testifying against Petitioner.

## III.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 imposes the

following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

6

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
court proceedings.
28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the

state court arrives at a conclusion opposite to that reached by the Supreme Court

on a question of law or if the state court decides a case differently than the Supreme

Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S.

362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An "unreasonable application

occurs" when "a state-court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case." *Id.*, 529 U.S. at 409. A federal habeas court

may not "issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly. Rather, that application must also be unreasonable."

*Id.*, 529 U.S. at 411.

Additionally, a federal court presumes the correctness of state court findings

of fact for habeas corpus purposes unless the petitioner rebuts the presumption with

clear and convincing evidence. *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir.2001);

28 U.S.C. § 2254(e)(1).

IV. Analysis

A. The Statement to the Police

7

Before trial, Petitioner moved to suppress the statement that he made to the police on October 30, 1998. A Walker[1] hearing was held. Detective Lieutenant Delmin Christian, from the Michigan State Police, and Sergeant Shari Oliver, from the Detroit Police Department Homicide Section, testified to the following: Petitioner was arrested in South Bend at around 6:00 or 7:00 pm on October 29, 1998. At the station in South Bend, at around 7:45 p.m., Sergeant Oliver advised Petitioner of his constitutional rights per Miranda.[2] Petitioner indicated to her that he understood and waived his rights, but he refused to sign the form. He did not request counsel or refuse to speak, or otherwise invoke his right to remain silent. She did not threaten him or make any promises to him. She did mention that his daughter was in custody. She made no record of what Petitioner told her, because she did not believe it. After three or four hours, at around midnight, she turned Petitioner over to Detective Christian for further questioning. She told Detective Christian that Petitioner was not saying anything to her. Detective Christian understood this to mean he was not answering her questions, although he was talking to her.

Detective Christian questioned Petitioner for about an hour and a half. The information Petitioner provided did not comport with the known evidence, so the detective made no record of it. He told Petitioner that his daughter was in custody

---

[1] *People v. Walker (On Rehearing),* 374 Mich. 331, 338, 132 N.W.2d 87 (1965).

[2] *Miranda v Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

8

and showed Petitioner photographs of his daughter and niece. Detective Christian made no threats or promises. At the end of the interview, Petitioner stated that he was tired and that he needed to think, but that he would make a statement the next day. It would be hard, Petitioner explained, because he would be telling on his daughter, his niece, and himself.

Detective Christian gave Petitioner his Miranda rights again on the morning of October 30, 1998, and Petitioner acknowledged the administration of rights and his waiver in writing on the form. Petitioner made a taped statement. On the tape, Petitioner again acknowledged that he had been advised of his rights, and that he had signed the waiver. He also acknowledged that he had not been threatened or made any promises, and that his statement was given voluntarily.

Petitioner testified at the hearing that Sergeant Oliver questioned him for a couple of hours before telling him his rights. He told her he did not want to talk, asked for a lawyer, and refused to sign the form. She ignored this, despite repeated requests for counsel. She, like Detective Christian, told him that his daughter had been arrested, and brought him a photograph of her. She finally left the room because he would not talk. When Detective Christian resumed the interrogation, Petitioner reiterated his requests for counsel and explained that it would not be wise to make a statement. Detective Christian, too, just ignored this. The next morning, officers came and got him out of the jail without his consent. Detective Christian spoke to him for about an hour and a half before the taping, and Petitioner again

9

said he did not want to make a statement and wanted counsel. Detective Christian left the room, then returned with pop and cigarettes. He talked to Petitioner about the trouble his daughter was in, that she was going to do life, and that Petitioner could help her by giving a statement.[3] To help her, Petitioner agreed to make a statement. Detective Christian frequently turned off the tape during the statement, particularly when Petitioner requested an attorney.

The trial court denied the motion to suppress, simply finding that the statement was voluntary.[4]

On appeal as of right to the Michigan Court of Appeals, Petitioner claimed that his statement was involuntary because the officers had persisted in questioning him despite his requests to remain silent and for counsel.[5] The Michigan Court of

---

[3] Petitioner does not claim that this rendered his statement involuntary. It should be noted that, while threats concerning family members can impact the voluntariness of a statement, see eg, *Lynumn v Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), here, the daughter and the niece had been arrested and did face the same charges. *See United States v. Westbrook*, 125 F.3d 996 (7th Cir.1997) (as long as agents had a good-faith basis for pressing charges against the defendant's wife, they impose no undue psychological coercion on a defendant by suggesting that it would be to his benefit to cooperate). Likewise, confronting the accused with the evidence against him is not unduly coercive, see *United States v. Toro-Pelaez,* 107 F.3d 819, 826 (10th Cir. 1997), *cert. den.* 522 U.S. 845, 118 S.Ct. 129, 139 L.Ed.2d 78 (1997).

[4] Although the trial court indicated that it would put its analysis on the record later, this was apparently not done.

[5] Although Petitioner, in his issue heading, both here and in the Michigan Court of Appeals, frames the constitutional violation as the police continuing the interrogation after he invoked his *Miranda* right to silence, the body of the argument itself includes that Petitioner also asserted his right to counsel under

Appeals recognized that a trial court must "view the totality of the circumstances in deciding whether a defendant's statement was knowing, intelligent, and voluntary." The Court of Appeals interpreted the trial court's ruling as a finding that the officers' testimony was more credible than that of Petitioner, a finding the Court of Appeals would not "second guess."  In light of the testimony at the Walker hearing, the Court of Appeals concluded that "there is no basis to overturn the trial court's finding of voluntariness because the record does not show that this finding was clearly erroneous."  Slip opinion, p. 3, 2002 WL 865455, *3.

Having reviewed the record, this Court is convinced that the state court's determination that Petitioner's confession was voluntary is neither contrary to United States Supreme Court precedent nor an unreasonable application of such precedent or of the facts.

The Fifth Amendment guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  To achieve this objective, the Supreme Court requires that law enforcement officers administer Miranda warnings before interrogating a suspect in custody.  The suspect must be informed prior to any questioning that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a

---

*Miranda*.  The Michigan Court of Appeals stated the issue as follows: "Defendant contends that the trial court erred by failing to suppress his statement to police because the police officers ignored his repeated requests to discontinue questioning and to allow him to speak to a lawyer."  Slip opinion, p. 2, 2002 WL 865455.  This Court will likewise address the issue.

right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 445.   These warnings are constitutionally required in order to combat the "compelling pressures inherent in custodial police interrogation" "and to permit a full opportunity to exercise the privilege against self-incrimination" guaranteed by the Fifth Amendment.  *Dickerson v. United States*, 530 U.S. 428, 440, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Miranda*, 384 U.S. at 467).  For a statement made by the accused to be admitted in evidence, the prosecution must show that the accused effected a voluntary, knowing, and intelligent waiver of his Miranda rights. Miranda, 384 U.S. 436, 444.

In order to fully honor the right to remain silent and to the assistance of counsel during interrogation, once a suspect invokes those rights, interrogation must cease. *McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir.2001) (quoting *Miranda*, 384 U.S. at 473-74: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). The circumstances under which subsequent questioning may occur vary depending on the nature of the right invoked by the suspect.

Were the facts as Petitioner asserted, that the interrogating officers ignored his requests for counsel and to remain silent, it would be clear that his constitutional rights had been violated, and that his statement was not admissible.  However, the trial court rejected Petitioner's testimony and believed the testimony of the officers: They described full compliance with Miranda and a voluntary waiver of rights by

12

Petitioner, both on the night he was arrested and again the following morning just before the taped statement was taken.  The officers denied that Petitioner requested counsel or asserted his right to remain silent.

The credibility of these witnesses falls within the category of issues to which the presumption of correctness is applied.  See *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997) (deferring to state court's finding that police officer testimony regarding voluntariness of statement was credible).  See also *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (federal habeas courts do not redetermine the credibility of witnesses whose demeanor has been evaluated by the state court).  Petitioner has not rebutted the state court's factual findings with clear and convincing evidence, particularly in light of Petitioner's acknowledgment of rights and voluntary waiver on the tape of the statement itself.


### B.  The prosecution's comments during jury selection

During jury selection, in the course of discussing the burden of proof with a prospective juror, the prosecutor commented, "I'm going to suggest to you, Mr. Webster, that this might be actually an opportunity–an opportunity to do justice for C.W. Crump and for the People of the State of Michigan."  The prosecutor later commented, in describing the role of counsel at trial, that, "[W]hen we argue it's really kind of advocating for our side, or course.  You recognize that that's my role and that's counsel's role.  He's a defense attorney and his job is to try to get him

off."[6]  There was not an objection to either comment.

On appeal as of right to the Michigan Court of Appeals, Petitioner argued that these comments violated his constitutional right to due process.  The Michigan Court of Appeals found that these claims were unpreserved, and accordingly applied the following standard of review[7]:

> Appellate review of allegedly improper remarks is precluded absent an objection unless a curative instruction could not have eliminated the prejudicial effect or where failure to consider the issue would result in a miscarriage of justice.
> Slip opinion, p. 3, 2002 WL 865455,*2 (quoting *People v Howard*, 226 Mich. App. 528, 544, 575 N.W.2d 16 (1997).

As to the initial comment, the Michigan Court of Appeals rejected the claim that this was an improper "civic duty" argument, and found that, even assuming it were similar, it could have been cured by a timely objection and a curative instruction.  As to the remark about the role of defense counsel, the Court of Appeals

---

[6] He then described his own role in more admiring terms: "My job is to try and present the evidence as best I can."

[7] In the context of unpreserved claims of prosecutorial misconduct, the Michigan Court of Appeals uses the curable by instruction/manifest injustice standard interchangeably with the plain error standard.  Compare *People v. Matuszak*, 263 Mich.App. 42, 48 687 N.W.2d 342 (2004); *People v. Barber*, 255 Mich.App. 288, 296, 659 N.W.2d 674 (2003) (unpreserved claims of prosecutorial misconduct are reviewed for plain error), with *People v. Rodriguez*, 251 Mich.App. 10, 30, 650 N.W.2d 96 (2002) ("Appellate review of allegedly improper conduct is precluded if the defendant fails to timely and specifically object, unless an objection could not have cured the error or a failure to review the issue would result in a miscarriage of justice," citing *People v. Stanaway*, 446 Mich. 643, 687, 521 N.W.2d 557 (1994).

agreed that this was clearly improper, but held that reversal was not warranted, since it was an isolated remark made early in the proceedings, and any prejudice could have been cured by a timely objection and curative instruction.

In his petition for writ of habeas corpus, Petitioner again argues that these comments by the prosecutor violated his constitutional right to due process. Respondent argues that this issue is procedurally defaulted and therefore barred from review, because Petitioner failed, in the trial court, to comply with Michigan's contemporaneous objection rule. This Court agrees.

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In the habeas context, this precludes federal courts from reviewing claims that a state court has declined to address because of a petitioner's noncompliance with a state procedural requirement. See *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). "In these cases, the state judgment rests on independent and adequate state procedural grounds." Coleman, 501 U.S. at 730.

A petitioner may avoid this procedural default only be demonstrating that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in petitioner's case. *Wainwright v. Sykes*, 433 U.S. at 87; *Coleman v. Thompson*, 501 U.S. at 750.

15

If a petitioner presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent, the cause and prejudice requirements may be excused. *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Rust v. Zent*, 17 F.3d 155, 162 (6th Cir. 1994).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Warner v. United States*, 975 F.2d 1207, 1213-14 (6th Cir. 1992), cert. denied, 507 U.S. 932, 113 S.Ct. 1315, 122 LEd2d 702 (1993). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729-30. Even if the last state court from which the petitioner sought review affirmed the conviction both on the merits, and, alternatively, on a procedural ground, the procedural default bar is invoked. *Rust*, 17 F.3d at 161. If the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

The Michigan Court of Appeals, in the last reasoned state court opinion, held that the issue was not preserved for appellate review because Petitioner failed to

16

object to the prosecutor's conduct at trial.  The Sixth Circuit Court of Appeals has held that the failure to object rule is regularly followed by Michigan courts in the context of prosecutorial misconduct claims.  *Simpson v. Jones*, 238 F.3, d 399, 408-409 (6th Cir. 2000); *Toler v. McGinnis*, 23 Fed. Appx. 259, 269 (6th Cir. 2001) (unpublished opinion).   See also, *People v. Schutte*, 240 Mich. App. 713, 613 N.W.2d 370, 377 (2000), overruled in part on other grounds *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Appellate review of allegedly improper conduct by the prosecutor is precluded where the defendant fails to timely and specifically object; this Court will only review the defendant's claim for plain error.").

Accordingly, the state court's judgment clearly rested on a procedural bar and the doctrine of procedural default is invoked.  Petitioner has made no showing of cause and prejudice, nor has he demonstrated that failure to consider this claim will result in a fundamental miscarriage of justice. Therefore, this Court may not review the claim.

Even if this issue were not procedurally barred, Petitioner would not be entitled to habeas relief.  For prosecutorial misconduct to rise to the level of a constitutional violation cognizable on habeas review, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The comments here were brief and isolated, and were not so prejudicial as infect the

17

trial with unfairness.

C. The prosecution's arguing anticipated bad acts evidence without notice

In opening statement, the prosecutor informed the jury that one of the witnesses would testify that Petitioner told her that it was his "practice" in Kalamazoo to run prostitutes and then to "gank" or rob their customers.  The following day, defense counsel put on the record that this argument had taken him by surprise, and explained that he had not objected at the time because he did not want to draw further attention to this.  He objected that he had not been given notice of similar acts evidence, as required by Mich. Ct. Rule 404(b), and asked the trial court to prohibit the prosecutor from introducing this evidence.  The defense did not move for a mistrial.  Ultimately, the trial court excluded the evidence because Petitioner had not received the requisite notice and because, though marginally relevant to modus operandi, the actions described in the argument were too remote in time.

On appeal as of right to the Michigan Court of Appeals, Petitioner argued for reversal under a plain error standard, claiming in part that unfair surprise by incriminating evidence denied him a fair trial, in violation of the due process clause of the federal constitution, and citing generally *Wardius v Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (where state requires defendant to disclose alibi witnesses in advance of trial, due process requires reciprocal discovery to defendant of alibi rebuttal witnesses).  Petitioner argued  that the "untimely disclosure" of the

18

other acts evidence prevented him from adequately questioning the prospective jurors as to how they might react to evidence of other bad acts, and whether they might convict based on evidence of propensity.[8]  Petitioner further argued that it was unrealistic to expect the jurors to disregard the prosecutor's comments.

The Michigan Court of Appeals held that a sua sponte grant of a mistrial is appropriate only if justice cannot be achieved without aborting the trial, and that Petitioner had not shown this manifest necessity.  The Court further held that, even if the prosecution's failure to provide notice were plain error, reversal would not be warranted, because the trial court granted the requested relief, the evidence was excluded, and Petitioner had not shown that he "is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings," citing *People v Hawkins*, 245 Mich. App. 439, 453, 628 N.W.2d 105 (2001), quoting *People v Carines*, 460 Mich. 750, 774, 597 N.W.2d 130 (1999).

In arguing that he is entitled to habeas relief, Petitioner again claims that the federal due process clause protects him from unfair surprise by incriminating evidence.

---

[8] Citing generally, *Morgan v Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (trial court's refusal to inquire whether potential jurors would automatically impose the death penalty upon convicting the defendant is inconsistent with the Due Process Clause of the Fourteenth Amendment); and *United States v Blount*, 479 F.2d 650 (6th Cir. 1973) (district court's refusal on defendant's request to ask if jurors could accept the proposition of law that a defendant is presumed to be innocent, has no burden to establish his innocence, and is clothed throughout the trial with this presumption, constituted reversible error).

The Michigan Court of Appeals did not misapply or unreasonably apply Supreme Court precedent in concluding that Petitioner was not entitled to relief.

Under Mich. R. Evid. 404(b)(2), prosecutors must provide reasonable notice prior to or during trial before seeking to admit evidence of a person's other acts. A habeas court, however, may grant relief only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(3) and 2254(a). Consequently, Petitioner's allegation that the trial court and prosecutor violated a state law relating to notice fails to state a claim on which habeas relief may be granted, unless the lack of notice rises to the level of a due process violation. See, *Doss v. Bock*, 2002 WL 1554363 *13 (E.D.Mich. 2002), citing *Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000).

In *Wardius v. Oregon*, supra, the case relied upon by Petitioner, the defendant was precluded from presenting an alibi witness and from testifying to the alibi himself, because he had failed to file a notice of alibi as required by state law. The Supreme Court reversed, because Oregon law did not provide for reciprocal discovery. "[T]he Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." 412 U.S. at 472. The Supreme Court noted that liberal discovery was salutary, because it reduced the possibility of surprise at trial, and enhanced the fairness of the adversary system. However, the Court also made it clear that the Due Process Clause did not mandate discovery rules generally, but rather that such

20

rules be reciprocal. "Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, ...it does speak to the balance of forces between the accused and his accuser." 412 U.S. at 474 (citations omitted). The Court concluded: "It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." 412 U.S. at 476.

Here, Petitioner was not penalized by the operation of procedural notice requirements imbalanced in favor of the prosecution. The prosecutor was required to give notice, and trial court excluded the evidence because he had not. Petitioner was thus protected from the "hazard" of surprise evidence.

Nor did the lack of notice unfairly limit Petitioner's questioning of prospective jurors about their reaction to "evidence" of prior bad acts, because the evidence was excluded and they were instructed that arguments of counsel are not evidence. If Petitioner believed that the jurors would be adversely affected by the prosecutor's argument, he could have moved for a mistrial, or at minimum to strike the argument or for a specific curative instruction.

Even if Petitioner established a constitutional violation, he would not be entitled to habeas relief. For purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless error standard is whether the error had a substantial and

injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In light of the overwhelming evidence of guilt, it cannot be said that either the lack of notice or the content of the prosecutor's argument had such an effect.

### D. The limitation on cross-examination of the accomplices.

Ms. Ellis testified that she was originally charged with first-degree murder, carjacking, armed robbery, and conspiracy to commit carjacking and armed robbery. She was allowed to plead guilty to second-degree murder and conspiracy to carjack, with a sentence agreement of 15-30 years for the murder, and 10 to 20 years for the conspiracy. In response to questioning by the prosecutor, she responded that the reason she was testifying was that she was guilty and needed to "fess up to it." When Petitioner on cross-examination tried to ask the witness what her sentence would have been had she been convicted of first-degree murder, the prosecutor objected, and the trial court sustained the objection. Petitioner thereafter elicited that the witness knew that her sentence would have been a lot different had she been convicted of the higher crime, so different that she voluntarily went to jail for 15 to 30 years.

Ms. Bush also testified to the same original charges, and the same plea and sentence agreement. In response to the prosecutor's question, she responded that she was testifying because what she did was wrong and that she hoped to be

22

forgiven for it.  She agreed, on cross-examination, that there was a substantial difference between the penalty for the original charges and the sentence she received.  After further argument by counsel on the question, the trial court again disallowed Petitioner from eliciting that, by pleading to the lesser offenses and agreeing to testify,  the witness had avoided a sentence of life without parole.  The trial court reasoned that this would impermissibly inform the jury of the penalty faced by Petitioner, which was contrary to Michigan law.

In closing argument, the prosecutor argued in part that the accomplices's sentences of 15 to 30 years were "no reward."[9]

On his appeal of right to the Michigan Court of Appeals, Petitioner argued that not permitting him to elicit from the accomplices that, by pleading guilty to lesser charges and agreeing to testify against him, they had avoided potential non-parolable mandatory life sentences, violated his federal and state constitutional rights to confrontation.  The Michigan Court of Appeals recognized that limitations on cross-examination which prevent a witness from exploring the bias, prejudice or credibility of a witness can constitute a denial of the right to confrontation.  Nonetheless, the Court held that, even assuming that the trial court erred in limiting

---

[9] "Whether or not they were offered a reward, yes, they plead guilty to the lesser charge and got a sentence, but I submit to you fifteen to thirty years is no reward.  There is no anticipation on their part of getting a lighter sentence.  Their sentence is over and done and consider whether or not they had a criminal record."  Trial transcript, 9/23/99, p 35.

the exploration of witness bias, such error is subject to a harmless error analysis. The Court concluded that the error here, if any, was harmless beyond a reasonable doubt, in light of the following: There was overwhelming evidence of guilt, there was ample evidence in addition to the testimony of the two women which established Petitioner's involvement in the crimes and which corroborated their version of events, and considerable testimony was elicited about the women's plea agreements and their incentive to testify.

The decision of the Michigan Court of Appeals to deny relief was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

This Court agrees with Petitioner that there was a constitutional violation. Nonetheless, the Michigan Court of Appeals was correct in holding that violation of a defendant's right of confrontation is subject to harmless error analysis. *Van Arsdall*, 475 U.S. at 684.   In a habeas corpus case, where a petitioner challenges his conviction collaterally, an error is harmless unless it "had a substantial and injurious effect on the jury's verdict." *Brecht v. Abrahamson*, supra, 507 U.S. at 637.  This cannot be found, even considering the attempts by the accomplices and the prosecutor to minimize their self-interested motivations in testifying.  The evidence of Petitioner's guilt   was overwhelming, even without the testimony of the accomplices.  For instance, Petitioner, in his own statement, admitted to hitting the victim with a pipe, to assisting in transporting the victim and disposing of the body,

24

and to keeping the victim's car and cell phone.  Even if the jury accepted his claim that he had nothing to do with the original planning, his own statement shows full participation in the plan from the point he found the two women struggling with the victim.  His mother testified to the blood in her basement and bedroom, blood identified as being that of the victim, and her comforter was found around the body of the victim.  Witnesses other than the accomplices established that Petitioner was driving the victim's car and using the victim's  cell phone in South Bend immediately after the victim disappeared.  DNA testing confirmed that presence of the victim's blood in the trunk of this car.  Furthermore, the jurors knew that the accomplices were allowed to plead guilty to lesser offenses to substantially reduce their potential liability, and considering their own admitted roles in this offense, the jurors were likely to view their testimony with scrutiny.  Accordingly, Petitioner is not entitled to habeas corpus relief with respect to this claim.

## V. Conclusion

IT IS HEREBY ORDERED that the petition for a writ of habeas corpus is DENIED and the matter is DISMISSED WITH PREJUDICE.


                                                             s/Arthur J. Tarnow
                                                             Arthur J. Tarnow
Dated: August 11, 2005                  United States District Judge

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 11, 2005, by electronic and/or ordinary mail.

                                                             s/Catherine A. Pickles
                                                             Case Manager